UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALVIN HILLS, Individually and on Behalf of All others Similarly Situated,<br><br>     Plaintiff,<br><br>  v.<br><br>PAC HOUSING GROUP, LLC; MOF PARC-FONTAINE, LLC (F/K/A GMF-PARC FONTAINE, LLC) MOF-PRESERVATION OF AFFORDABILITY CORP. (F/K/A GMF- PRESERVATION OF AFFORDABILITY CORP.); MINISTRY OUTREACH FOUNDATION (F/K/A GLOBAL MINISTRIES FOUNDATION); and RICHARD HAMLET,<br><br>     Defendants. | C.A. NO.: 2:23-cv-05740-BWA-KWR<br><br><u>CLASS ACTION</u><br><br>JUDGE:       Hon. Barry W. Ashe<br><br>MAG. JUDGE:  Hon. Karen Wells Roby |

**<u>FIRST SUPPLEMENTAL AND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES & DECLARATORY RELIEF</u>**

**NOW INTO COURT**, through undersigned counsel, comes Alvin Hills ("Mr. Hills") who, on behalf of himself and others similarly situated, respectfully supplements and amends his Complaint for Damages.  This First Supplemental and Amended Complaint adds additional named plaintiffs, references to federal law, and clarifying facts.

## I.      PARTIES

### 1.

Made Plaintiffs herein are:

a.  **DONNELL MATLOCK** ("Ms. Matlock"), a person of the full age of majority and

domiciled in Orleans Parish, Louisiana, brings this suit individually and in a representative

1

capacity for those who are similarly situated.  She is a former resident of the Parc Fontaine Apartment Complex located at municipal address 3101 Rue Parc Fontaine, New Orleans, Louisiana 70131.  At all relevant times, Ms. Matlock fulfilled her obligations pursuant to the contract of lease (*e.g.*, paying rent).

b. **ALVIN HILLS** ("Mr. Hills"), a person of the full age of majority and domiciled in St. Tammany Parish, Louisiana, brings this suit individually and in a representative capacity for those who are similarly situated.  He is a former resident of the Parc Fontaine Apartment Complex located at municipal address 3101 Rue Parc Fontaine, New Orleans, Louisiana 70131.  At all relevant times up until he moved out of the premises due to health and safety concerns that Defendants refused to remedy, Mr. Hills fulfilled his obligations pursuant to the contract of lease (*e.g.*, paying rent).

c. **JACK MARTIN** ("Mr. Martin"), a person of the full age of majority and domiciled in Orleans Parish, Louisiana, brings this suit individually and in a representative capacity for those who are similarly situated.  He is a long-time, current resident of the Parc Fontaine Apartment Complex located at municipal address 3101 Rue Parc Fontaine, New Orleans, Louisiana 70131.  At all relevant times, Mr. Martin fulfilled his obligations pursuant to the contract of lease (*e.g.*, paying rent).

**2.**

Made Defendants herein are:

a. **RICHARD HAMLET** ("Hamlet"), a natural person of the full age of majority and domiciled in the State of Tennessee from where he directs the operations of MOF-Preservation, Parc-Fontaine LLC, PAC, and the Foundation.

b. **MOF-PRESERVATION OF AFFORDABILITY CORP. (F/K/A: GMF-PRESERVATION OF AFFORDABILITY CORP.)** ("MOF-Preservation"), a foreign non-profit corporation incorporated in the State of Tennessee and doing business in the Parish of Orleans, State of Louisiana with a principal business establishment in Louisiana located at 3101 Rue Parc Fontaine, Building 19, New Orleans, Louisiana, 70131 and a registered office in Louisiana located at 201 St. Charles Avenue, Suite 3201, New Orleans, LA 70170.  MOF-Preservation is a current owner of the Parc Fontaine Apartment Complex located at municipal address 3101 Rue Parc Fontaine, New Orleans, Louisiana 70131.

c. **MINISTRY OUTREACH FOUNDATION (F/K/A: GLOBAL MINISTRIES FOUNDATION)** ("the Foundation") is registered as a Tennessee 501(c)(3) organization. The Foundation wholly owns MOF-Preservation.

d. **MOF PARC-FONTAINE, LLC (F/K/A: GMF-PARC FONTAINE, LLC)** ("Parc-Fontaine LLC"), a foreign limited liability company organized under the laws of the State of Tennessee and doing business in the Parish of Orleans, State of Louisiana with a principal business establishment in Louisiana located at 3101 Rue Parc Fontaine, Building 19, New Orleans, LA 70131 and a registered office in Louisiana located at 201 St. Charles Ave., Suite 3201, New Orleans, LA 70170.  Parc-Fontaine LLC is a former title owner of the Parc Fontaine Apartment Complex located at municipal address 3101 Rue Parc Fontaine, New Orleans, Louisiana 70131.  It acquired the property on December 19, 2012 and transferred the property to MOF-Preservation (at that time GMF-Preservation) for $0 in 2016.

e. **PAC HOUSING GROUP, LLC** ("PAC"), a foreign limited liability company organized under the laws of the State of Tennessee and doing business in the Parish of Orleans, State

of Louisiana with a principal business establishment in Louisiana located at 201 St. Charles

Avenue, Suite 3201, New Orleans, Louisiana 70170 and a registered office in Louisiana

located at 201 St. Charles Avenue, Suite 3201, New Orleans, LA 70170.  Upon information

and belief, PAC is and at all relevant times has been the property management company

for the Parc Fontaine Apartment Complex located at municipal address 3101 Rue Parc

Fontaine, New Orleans, Louisiana 70131.

Together, these entities are collectively referred to as "Apartment Defendants" and together with

Hamlet (the "Defendants").

## II.    JURISDICTION AND VENUE

### 3.

This Court has personal jurisdiction over Hamlet and Apartment Defendants because they

are authorized to do business in this state, regularly contract in this state, and have minimum

contacts in Louisiana such that maintenance of this suit will not offend traditional notions of fair

play and substantial justice (including purposefully directing business to those within this state).

For example, Defendants have transacted business in this state (through lease agreements and bond

financing applications); contracted to provide housing services in this state; and have interest in

immovable property in this state, including but not limited to the Parc Fontaine Apartments.

### 4.

Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1441 together

with 28 U.S.C. § 98 and/or in 28 U.S.C. § 1391.

### 5.

This Court has subject matter jurisdiction over this cause of action pursuant to

28 U.S.C. § 1332(d).

### III.    FACTUAL ALLEGATIONS

*Defendants' Background and Pattern of Operation*

**6.**

Apartment Defendants own, operate, and manage the Parc Fontaine Apartment Complex, located at municipal address 3101 Rue Parc Fontaine, New Orleans, Louisiana 70131 (hereinafter "Parc Fontaine Apartments").

**7.**

Parc Fontaine Apartments is a complex with 702 units.  Parc Fontaine Apartments has different unit options, including 1-, 2-, and 3-bedroom apartments.  Upon information and belief, unit prices range from $710.00 to $1,220.00 per month, with additional fees (for example, for pets) that may apply.

**8.**

All Apartment Defendants are either directly or indirectly run by Hamlet.  Hamlet is the President of MOF-Preservation.  MOF-Preservation is the sole Member of Parc-Fontaine LLC.  Additionally, PAC's website lists him as the Chief Executive Officer ("CEO") on its leadership team page and the Foundation's website lists him as President/CEO.

**9.**

Across states lines, across party lines, and across the years, the Foundation and Hamlet have drawn almost universal condemnation for deplorable living conditions, ill-gotten taxpayer money, and misrepresenting the nature of their housing units.

**10.**

In 2003, Hamlet founded Global Ministries Foundation.  (Global Ministries Foundation changed its name to Ministry Outreach Foundation in 2022).

**11.**

The Foundation is a self-styled religious non-profit.  Over the years, the Foundation has explained what it does in the following ways: "Providing affordable housing across the United States and ministering to the physical, spiritual and emotional needs of our residents" as well as "..[C]ollaborat[ing] with individuals and churches to reach the world with the gospel of Jesus Christ and to minister to those in need."

**12.**

Yet, Hamlet has also stated: "This is a business.  This isn't a church mission.  These are business corporations that we set up, but we're no different from a real estate investment trust or a private equity group."[1]

**13.**

In 2016, Senator Marco Rubio (R) ("Senator Rubio") gave a speech on the United States Senate Floor, revealing his take on Hamlet and his affiliated entities and properties.  Senator Rubio's speech focused on a housing project in Florida called Eureka Garden.  As will be discussed in more detail below, the issues at Eureka Garden bear a striking resemblance to the issues at Parc Fontaine.

**14.**

Eureka Garden was a low-income, affordable housing project that used Section 8 funds to house low-income individuals.

**15.**

Senator Rubio introduced the situation this way:

"[Eureka Garden is] run by an organization that owns it. It's called Global Ministries Foundation. It's run by Reverend Richard Hamlet. It's organized as a

---

[1] https://www.congress.gov/amendment/114th-congress/senate-amendment/4039/text.

501(c)(3), the organization that owns this building. And Mr. Hamlet, as I've said, Reverend Hamlet, is the head of the organization.

You look at their website for Global Ministries, there is a link that says 'What We Do.' And if you go on that section of Global Ministries, here's what it says that they do. It says, 'Providing affordable housing across the United States and ministering to the physical, spiritual and emotional needs of our residents.' That's what they state as their business purpose, and I imagine, that's what they needed to state because of their 501(c)(3) not-for-profit status.

However, we have a quote here from Reverend Hamlet, who has said that his involvement in housing is purely business related. He said, 'This is a business. This isn't a church mission. These are business corporations that we set up, but we're no different from a real estate investment trust or a private equity group.'

That's how he described his 501(c)(3) not-for-profit Global Ministries Foundation. Now Global Ministries Foundation has over 40 properties in multiple states, in Alabama, in Florida, in Indiana, in Louisiana, North Carolina, New York, Tennessee, and Georgia. In all of these states and all of these properties, they have over 5,000.[2]

**16.**

Senator Rubio described Eureka Gardens as being in "horrifying condition"—with mold on the walls, 15-year-old-appliances, and where windows did not open and staircases were literally falling down. The city evacuated the residences and condemned the property.

**17.**

Senator Rubio continued by explaining that at first, he thought the problems at Eureka Gardens were unique to that one property. However, further investigation showed that conditions at Eureka Gardens were part of a disturbing pattern of neglect by Hamlet properties. Two complexes in Memphis had such poor living conditions that the U.S. Department of Housing and Urban Development ("HUD") pulled their funding. In Atlanta, another property was "plagued by rodents and sewage"—with one former resident reporting that he moved out of the facility even

---

[2] Exhibit 1, May 18, 2018, Senator Rubio, Press Release.

though he had nowhere to go because homelessness was better than remaining at a Hamlet property.  It was a similar story at other properties too—including Windsor Cove apartments (in Orlando, Florida) and Goodwill Village (a third property in Memphis, Tennessee).

**18.**

Senator Rubio also reported that one 4-year-old living at Eureka Gardens was suffering from lead poisoning, which her mother thought she'd gotten from living at the apartment.  Senator Rubio said:  "Section 8 housing is federal taxpayer money going into the hands of these slumlords, and now a child has lead poisoning because of it."

**19.**

Senator Rubio continued:

So you would ask yourself, all right, so you have these owners of all these units and they're getting this federal money under this HUD contract. Where does all the money go? What are they doing with all this money that they make?

Well, you can look at their 990 tax forms, which are available for all 501(c)(3) organizations. Let me tell you about the 2014 tax year, which is the most recent one that's available. In the year 2014, the Reverend Richard Hamlet paid himself $495,000 plus $40,000 in non-taxable benefits.

Also in 2014, the Reverend Hamlet's family members were paid an additional $218,000. By the way, he had previously failed to disclose his family members' compensation on tax forms, which is in violation of IRS rules that require CEO's to disclose the compensation of all family members who work for an organization.

The IRS reports also show that between 2011 and 2013, Global Ministries Foundation, the landlord that owns all of these units in all of these buildings that your taxpayer money is paying for, they shifted $9 million away from the low-income housing not profit to its religious affiliate.

And there is no one here who is a more strident proponent of private and public partnerships, of faith-based initiatives, but you have these buildings that are crumbling. You have these people living in these deplorable conditions, and they took, in addition to paying himself half a million dollars and his family another $200,000, they took $9 million, and instead of using it to fix these units, they transferred it to the other entity they had for religious purposes.

They don't seem to want to spend the money, including the taxpayer money on making repairs, on making sure places like Eureka Garden are livable.

**20.**

Senator Rubio noted that instead of spending their money—including taxpayer money—on making their facilities livable, they spent their money on public relations specialists and lawyers.

**21.**

Senator Rubio explained: "Let me tell you what this behavior is, let me tell you what **Global Ministries Foundation is; it is a slumlord**. They are slumlords, and **there are people that are living in deplorable conditions while your taxpayer money is going into their bank account, and they are laughing at us. . . . This, my friends, is the stealing of American taxpayer money, subjecting people to slum-like conditions, pocketing the money, living off the money and transferring the money.**" (emphasis added).

**22.**

**Senator Rubio then issued a dire warning:**

This is unacceptable and it's happening right underneath our nose. Today it's Eureka Garden, but I already told you all the states. In fact, **I encourage my colleagues who live in the states of** Alabama, and Indiana, and **Louisiana**, and North Carolina, and New York and Georgia, you should **look into the properties that Global Ministries Foundation operates in your states.**

Because if the trends continue, if the trends hold up, then I almost guarantee you that you are going to find slum-like conditions in your state the way I found in mine and the way they found in Tennessee. . . . (emphasis added).

**23.**

When scrutiny heated up against Hamlet properties in Tennessee and Florida in approximately 2016, the Hamlet network responded by selling those properties rather than fixing the properties and living up to its end of the bargain.[3]

**24.**

Parc Fontaine Apartments is a Louisiana-based apartment complex in the Hamlet network of properties.

**25.**

During a September 29, 2022 hearing of the Governmental Affairs Committee in New Orleans, Councilman Freddie King ("Councilman King") reported what he had seen first-hand on a recent walkthrough of Parc Fontaine regarding general problems: "What I saw myself was, was **mold**, um, **pools that were, that were filled with water – that were green** with – with **broken gates** to the pool, uh, there was **no security guard** at the front gate, the gate stayed – uh, the **gate stayed open**,…" Aside from the problems with common areas mentioned above, he also noted apartment-unit-specific problems.[4]

**26.**

Louisiana State Representative Jason Hughes (D) (Representative Hughes") has also taken note of the problems at Parc Fontaine. In a November 2022 news report, when the reporter suggested that the Parc Fontaine conditions were particularly egregious given that the complex had a religious non-profit at the helm, Representative Hughes retorted: "**Well they claim to be religious**." He continued, explaining that "to hide behind the auspices of religion, uh, when you're

---

[3] https://wreg.com/news/on-your-side/gmf-selling-goodwill-warren-tulane-and-other-properties-across-southeast/.
[4] Governmental Affairs Committee, https://www.youtube.com/watch?v=7x-7Nwz_c88&t=3813s.

supposed to be doing right not only by people, but some of the most vulnerable people in the world, uh, and you're treating them like this – truly, truly says a lot.[5]  Representative Hughes explained that, "**At the end of the day … they're slumlords**."[6]

### 27.

Now that scrutiny is heating up for Louisiana properties like the Willows and Parc Fontaine, the Hamlet network is in the process of trying to sell those properties rather than uphold its agreement to provide quality housing in Louisiana.

### 28.

Defendants have drawn the ire of Louisiana politicians not just because of the deplorable conditions at their facilities, including Parc Fontaine, but also because they are taking advantage of the system.  Although politicians have expressed skepticism of the purportedly non-profit and religious nature of Hamlet's organizations, they note that by claiming non-profit status, the Defendants have received numerous benefits.

### 29.

First, because Parc Fontaine is owned by MOF-Preservation, which is registered as a non-profit, it has paid $0.00 in property tax.

---

[5]  https://www.fox8live.com/2022/11/15/fox-8-defenders-nonprofit-that-owns-willows-received-millions-state-financing/
[6]  https://www.fox8live.com/2022/11/15/fox-8-defenders-nonprofit-that-owns-willows-received-millions-state-financing/

**30.**

New Orleans City Council President Helena Moreno explained this problem: "When you issue fines and things like that, it really doesn't matter, because there's really no tax bill.  So that's how [Hamlet] kind of can skate around these different things."[7]

**31.**

Second, it receives federal funding in the form of Section 8 vouchers.

**32.**

Third, in 2012, the state bond commission approved $35 million in financing for Global Ministries to purchase Parc Fontaine and another local apartment complex, The Willows.[8]

**33.**

Plaintiffs first discovered the misrepresentations that Defendants made to the State of Louisiana on or about November 14, 2022, when the local news started running stories about how the Foundation had received state financing.

*Defendants' Said They Would Provide Services and Amenities*

**34.**

When Parc-Fontaine LLC and the Foundation applied for state financing to purchase Parc Fontaine and another property, it claimed it wanted "not only to provide safe, decent, and sanitary housing, but also to give our residents access to educational and training venues which should improve their toolset in becoming more productive and gratifying citizens in their community and of this country."

---

[7]   https://www.fox8live.com/2022/11/15/fox-8-defenders-nonprofit-that-owns-willows-received-millions-state-financing/
[8]   https://www.fox8live.com/2022/11/15/fox-8-defenders-nonprofit-that-owns-willows-received-millions-state-financing/

**35.**

Parc Fontaine dangled a laundry-list of services to the State that it said it would provide to

residents:

> A. Upon the closure of this housing asset , with 702 rental units there will be approximately 3,000 individuals ( adults and children) who will live in our housing community and we will have the opportunity as owner to provide them with beneficial supportive services on site including the following:
>
> 1. Access to after school tutoring for children of housing community.
> 2. Job training/vocational enhancement workshops
> 3. Computer learning/training sessions
> 4. Literacy training and Hygiene/Housekeeping instruction
> 5. Access to pregnancy counseling professionals
> 6. Access to Alcohol/Drug dependency rehabilitation
>
> In addition to these "social" services to be provided at no cost to the residents, there will be other services offered to our residents which are "voluntary" and available for our residents including:
>
> 1. Group sessions for residents who desire to discuss major life issues and consider practical solutions to numerous real time stress related issues
> 2. A resident "alert line" phone number to call in crisis situations that may arise.

**36.**

PAC is still spouting these promises today.  On its website, under a section entitled "WHY

WE ARE DIFFERENT," PAC states: "Our Workforce Properties are apartment properties that are

beyond the 'brick and mortar.'  We strive to create a community that not only enhances the lives

of its residents through **many social impact programs**, but also has a positive impact on the

greater community and neighborhoods to which the property belongs.  We deliver on this promise

through our commitment to **supporting the residents** of our properties."  (emphasis added).   On

its "Our Mission" page, PAC states: "By working with local partners, PAC Housing Group offers

each housing community services based on location and resident needs.  All services are provided

at *no* cost to the residents and are completely *voluntary*."[9]  Directly below this proclamation, there

---

[9] https://pachousinggroup.org/our-mission/

is a photograph of a child sitting at a computer screen, suggestive of the after-school tutoring for kids and computer training sessions the Foundation had promised to provide.

**37.**

Representative Hughes has stated: "This bill of goods that [Hamlet and his organizations have] sold, they clearly have not delivered on."[10]

**38.**

Similarly, at the time Defendants were applying for State financing, they included photographs of a gleaming pool and clean, functioning laundry rooms. The Parc Fontaine Apartment website also lists similar amenities, specifically listing the following:[11]

**Amenities:**
- 2 Fitness Centers
- 4 Large Laundry Facilities
- 6 Swimming Pools
- Ceiling Fans
- Convenient to New Orleans Central Bus [sic] District
- Conveniently located within the Algiers area
- Fully equipped kitchens
- Gated Community
- Impressive oak-lined street
- Large oversized closets
- Off street parking

**39.**

In April 2023, residents of the Willows—another local apartment complex affiliated with the Foundation, PAC, and Parc-Fontaine LLC—filed a class action lawsuit for living conditions at The Willows, which are similarly deficient. That case named additional defendants unrelated to this lawsuit and is only for Willows tenants. This case is solely on behalf of Parc Fontaine tenants.

---

[10] https://www.fox8live.com/2022/11/15/fox-8-defenders-nonprofit-that-owns-willows-received-millions-state-financing/
[11] https://parcfontaine.org/

*Reality of Social Programs*

**40.**

Upon information and belief, Defendants do not offer any of the social impact programs outlined above, nor do they provide support to residents.

**41.**

Defendants never verbally mentioned anything about access to any of the social impact programs listed above to Plaintiffs or other tenants.

**42.**

Upon information and belief, Defendants never mailed Plaintiffs or other tenants any mailers or letters about offering or availability of any of the social impact programs listed above. Plaintiffs never received any mailers or letters about these programs.

**43.**

Although Defendants at times would communicate information to tenants by posting information on their doors, Plaintiffs never had anything posted on their apartment doors regarding offerings of or availability for any of these social impact programs.

**44.**

Plaintiffs never saw any publicly-posted posters or fliers about offerings of or availability for any of these social impact programs.

**45.**

Defendants do not operate, and upon information and belief at no time relevant to this case operated, a resident "alert line."

**46.**

Even leaving aside the lack of social impact programs, Defendants have also chosen not to provide even basic support services to residents.  When residents report issues, their concerns are ignored or, if not ignored, typically marked by prolonged delays in responsiveness or poor work product.  For example, rent payment systems are poorly managed, repair requests routinely are not adequately addressed, etc.

*Plaintiff-Specific Factual Allegations*

**47.**

*Ms. Matlock*

Ms. Matlock rented a one-bedroom, one-bathroom, second-floor apartment for $595.00 per month.  She moved into his Parc Fontaine apartment in approximately March 2018 and moved out in August 2022.  She endured a series of obstacles trying to safely exist at Parc Fontaine, including a series of issues dealing with unresponsive management and maintenance that resulted in her kitchen ceiling collapsing and sky-high electricity bills due to holes in the unit and lack of insulation.  Despite her numerous pleas to management and office personnel, which accompanied most of her rental payments, Defendants never adequately fixed the problems she was dealing with.  She also experienced drywall covered with mold and had to use buckets to catch leaking water from the roof due to unresponsive management and maintenance.



*Photograph of Collapsed Kitchen Ceiling*

**48.**

In additional to deficient management and maintenance services, Ms. Matlock's other issues included, but were not limited to, pests, including bedbugs; lack of gym access; safety concerns involving deficient lighting and broken gates; unresponsive management; sewage backup near the front laundry room; and empty and unpoliced apartments with doors busted in that allowed for standing water and mold to flourish.

*Mr. Hills*

**49.**

Mr. Hills rented a three-bedroom, first-floor apartment for $1,010.00 per month. He moved into his Parc Fontaine apartment on or about December 27, 2022. He moved out a few months later, in approximately March 2023, after enduring a series of obstacles trying to safely exist at Parc Fontaine. Almost immediately, upon moving in he had a series of issues dealing with unresponsive management and maintenance.

**50.**

For example, there was a leak in Mr. Hills' bathroom coming from the air conditioner compressor. At first, Parc Fontaine said they did not see a leak. Later, they finally acknowledged there was a problem, but instead of fixing the underlying moisture damage and its cause, Defendants merely fixed the tile on top of it. His bathroom ceiling eventually caved in after Parc Fontaine ignored the issue for months. Also, Mr. Hills had repeated issues using the card machine in the laundry facility. Parc Fontaine employees told him they were having issues and that they needed a new machine, but the new machine never arrived during his time there. Although Mr. Hills's specific property damage within his apartment (such as damage to his personal items from the problems in his unit) is not part of this lawsuit, the unresponsive, unreliable maintenance and management systems which negatively impacted all tenants are part of this lawsuit. Finally, Parc Fontaine negligently maintained its rent payment and management systems. In particular, Parc Fontaine at one point told Mr. Hills that he owed rent even though he had already paid it. In response, Mr. Hills was able to produce signed stubs from timely payment for that issue.[12] Ultimately, due to Defendants' refusal to fix the problems in Mr. Hills' unit and at the complex generally, the conditions at Parc Fontaine were so unsafe and unsanitary and that Mr. Hills had to relocate during his lease term; even though the conditions were unliveable, Defendants continued to charge him rent and tried to evict him for lack of payment. As a result of Defendants' attempts and the unliveable conditions, Mr. Hills agreed to move out of Parc Fontaine pursuant to a consent judgment. Upon information and belief, Parc Fontaine has actual knowledge, or in the alternative has constructive notice, of the negligent rent payment systems, since one employee got caught

---

[12] Attached as Exhibit 2, Pay Stubs.

pocketing rent via CashApp, to the tenants' detriment. Nonetheless, upon information and belief, the rental payment system problems persist.

*Mr. Martin*

**51.**

Mr. Martin is a long-time tenant of Parc Fontaine and has resided there for over twenty-five (25) years. He does not have family, so Parc Fontaine is his community. He even lived there during the aftermath of Hurricane Katrina as a presence to stave off looters and defend his community. After Hurricane Katrina, the prior owners made a number of renovations to the complex. Under current ownership and management, Mr. Martin has experienced greater dread, despair, and anxiety from the ongoing neglect of the premises than he ever has before.

**52.**

Mr. Martin remembers when Defendants took over the apartment complex. Although Defendants chose not to communicate any of the promised services to tenants by placing flyers on their doors, Defendants did place flyers on tenants doors around the time they took over Parc Fontaine for another purpose. Those flyers invited tenants to come to a meet-and-greet style event, where management introduced themselves and discussed starting a community-watch program. Defendants never started the community watch program discussed at that meeting.

**53.**

A couple of years after Defendants took over ownership and management of Parc Fontaine, Mr. Martin observed the conditions deteriorate. Mr. Martin has observed skyrocketing crime, including drug transactions as well as trash and garbage littering the complex. He has seen people and families he has known for years be forced out of the community.

**54.**

The fire alarms had had frequent problems, including the fire alarm boxes being broken open and rendered inoperable.  Only recently, approximately a year ago—*after* complaints to the fire marshal and the active fire in a building near to Mr. Martin's threatening his and others' health and safety—did Defendants finally install a new fire alarm system.

**55.**

At one point, Defendants messed up with his check payment due to one employee skipping town, resulting in Defendants missing checks; as a result, Defendants threatened him with a late fee.  At another point, Defendants claimed to have lost Mr. Martin's cashier's check, but he provided a receipt.  In fact, once due to a cancer scare, Mr. Martin actually paid a month's rent in advance, so that if he got ill Defendants would not evict him when he was in the hospital. Subsequently, he found out that this rental buffer had disappeared from his account.  When he approached management, he was told that he just "needed to understand" that sometimes these things happen and money gets "absorbed" by Parc Fontaine accounts.  Defendants only partially credited his account with approximately $305 of the missing $605 dollars.

*Defendants Operate as a Single Business Enterprise*

**56.**

Defendants operate as a single business enterprise with Hamlet at the helm.  Illustrative examples of this commonality-of-enterprise include common offices, common leadership, substantial identity of ownership, excessive fragmentation, centralized accounting, unified administrative control, and causing the incorporation of each other.  These illustrative examples are explained in more detail below.

**57.**

First, Defendants have a <u>common office</u>.  The Foundation, PAC, MOF-Preservation, and Parc-Fontaine LLC all list 65 Germantown Court, Ste. 409, Cordova, TN 38018 as their main office address.[13]  Richard Hamlet is the registered agent for the Foundation, and his address as registered agent for the Foundation is listed as 65 Germantown Court, Ste. 409, Cordova, TN 38018.  Additionally, PAC, MOF-Preservation, and Parc-Fontaine LLC, all share the same registered office in Louisiana: 201 St. Charles Avenue, Ste. 3201, New Orleans, LA 70170.

**58.**

Second, Defendants have <u>common leadership</u>.  Hamlet is the President/CEO and Chairman of the Board of the Foundation and the CEO of PAC.  The Apartment Defendants also share other directors.  For example, R. Lucian Hamlet is the Director of Asset Management Services at the Foundation and the Director of Asset Management at PAC.  Additionally, Hunter Hamlet is the Director of Investment Oversight at the Foundation and PAC.  MOF-Preservation is the Officer of PAC.

---

[13] The fields of principal domicile address, mailing address, and principal business office address are all accessible on the Louisiana Secretary of State website, and PAC, Parc-Fontaine LLC, and MOF-Preservation are all registered in Louisiana.  PAC, Parc-Fontaine LLC, MOF-Preservation all share the same principal domicile address, the same mailing address, and the same principal business office address based on their filings with the Louisiana Secretary of State.  The Foundation is not registered in Louisiana, but it is registered in Tennessee.  The Tennessee Secretary of State's website does not list all these fields as such for the Foundation, but instead lists a "registered agent address" and a "principal address"—both of which are 65 Germantown Ct., Ste. 490, Cordova, TN 38018.    Additionally, MOF-Preservation is also registered in Tennessee; its entry with the Tennessee Secretary of States lists its mailing address as 65 Germantown Ct. Ste 409, Cordova, TN 38018.

**59.**

Third, Defendants have <u>common employees</u>.  For example, Michael Tankersley is the Staff Accountant at the Foundation and PAC.  Lillian E. Eyrich is the registered agent for PAC, MOF-Preservation, and Parc-Fontaine LLC.

**60.**

Fourth, Defendants have <u>identity or substantial identity of ownership</u>.  Hamlet is the President/CEO of the Foundation, which does not have any members or shareholders.  The Foundation wholly owns MOF-Preservation and Parc-Fontaine LLC.  In other words, Hamlet directs the Foundation and PAC, which in turn wholly own the other two defendants, MOF-Preservation and Parc-Fontaine LLC.

**61.**

Fifth, these entities all demonstrate <u>excessive fragmentation</u> of a single enterprise into separate corporations.  At their core, they are all run by Hamlet, and they all operate in tandem to operate the Parc Fontaine Apartments.

**62.**

Sixth, Defendants have <u>centralized accounting</u>.  Michael Tankersley is the Staff Accountant at both the Foundation and PAC, both of which operate out of a central office, located at 65 Germantown Court, Ste. 409, Cordova, TN 38018.  That same central office for the Foundation and PAC is also the main office for MOF-Preservation and Parc-Fontaine LLC and the office location of Hamlet.

**63.**

Seventh, there is <u>unified administrative control for similar business functions</u> of all Defendants.  Although layered behind different corporate structures, Hamlet controls all the

Apartment Defendants.  His address as registered agent for the Foundation is the same main address for all Defendants: 65 Germantown Court, Ste. 409, Cordova, TN 38018.  All these entities own and operate housing complexes, a similar business function.

**64.**

Eighth, Defendants also have <u>caused the incorporation</u> of each other.  Hamlet founded the Foundation and is President/CEO of the Foundation.  Upon information and belief, Hamlet also caused the incorporation of MOF-Preservation in his role as the President of MOF-Preservation.  In turn, MOF-Preservation is the officer of PAC and Parc-Fontaine LLC, and upon information and belief caused the organization of PAC and Parc-Fontaine LLC in its role as Officer of PAC and Parc-Fontaine LLC.

**65.**

In addition to these facts, the unity of ownership and operation is also further explained as follows.  First, the relationship of the entities supports this unity.  Hamlet is the CEO of PAC (for-profit entity) and the Foundation (non-profit entity).  The Foundation owns and operates Parc-Fontaine LLC (for-profit entity) and MOF-Preservation (non-profit entity).  In 2012, Parc-Fontaine LLC filled out the paperwork to apply for State financing as the applicant/beneficiary for the bonds.  Yet the Parc-Fontaine LLC letter that is part of the finance application file is on Foundation Letterhead.  Additionally, the letter at times uses Global Ministries Foundation and Parc-Fontaine LLC interchangeably.  For example, the letter is on Foundation letterhead, the top of the letter shows "GMF Parc Fontaine, LLC" in the area where a typical subject would be, and then the body of the letter references GMF (generally) and states that the "GMF mission statement" is to "to multiply missions, monies and mentoring around the Globe for the temporal and eternal welfare of persons in need."  Although that section does not articulate whether the "GMF mission"

referenced is for GMF Parc Fontaine, LLC, Global Ministries Foundation, or both, the implication is that it applies to the Foundation (a non-profit) and not the LLC (a for-profit).  The State ultimately did provide financing for Parc-Fontaine LLC to purchase the property.  Yet, in 2016, Parc-Fontaine LLC transferred the entire property to MOF-Preservation, a non-profit entity.  Since it is now owned by a non-profit entity, it does not have to pay property taxes.

**66.**

In 2018 alone, GMF Parc Fontaine, LLC earned $5,245,309 in total income and had end-of-year assets of $26,700,953.[14]  That same year, MOF-Preservation gave $10,050,000 to the Foundation.[15]  In 2019 alone, the most recent year for which the 990 forms are publicly available on the IRS website, GMF Parc Fontaine, LLC earned $5,518,738 in total income and had end-of-year assets of $26,184,475.[16]

**67.**

In 2018, MOF-Preservation paid Hamlet $352,000 in compensation and non-taxable benefits and the Foundation paid Hamlet $417,000 in compensation and non-taxable benefits.[17]  In 2019, the most recent year for which the 990 forms are publicly available on the IRS website, MOF-Preservation paid Hamlet $397,000 in compensation and non-taxable benefits and the Foundation paid Hamlet $462,000 in compensation and non-taxable benefits.[18]

---

[14] Exhibit 3, 2018 Tax Return for MOF-Preservation, p. 54.
[15] Exhibit 4, 2018 Tax Return for the Foundation, p. 14.
[16] Exhibit 5, 2019 Tax Return for MOF-Preservation, p. 50.
[17] Exhibit 4, 2018 Tax Return for the Foundation, p. 42; Exhibit 5, 2018 Tax Return for MOF-Preservation, p. 31.
[18] Exhibit 5, 2019 Tax Return for MOF-Preservation, p. 30; Exhibit 6, 2019 Tax Return for the Foundation, p. 43.

*The Standard Lease Agreement*

**68.**

Parc Fontaine tenants sign a standard-form lease agreement ("the Lease").   Upon information and belief, the only things that vary are slight differences based on the unit selected (*e.g.*, number of bedrooms and lockstep rent adjustments based on those selections).

**69.**

The Lease requires the owner to keep common areas reasonably clean; maintain fixtures and equipment (such as the pool gates and security gate); comply with safety, sanitation, and fair housing law; and make reasonable repairs.

**70.**

For instance, the Lease contains a section entitled the "Responsibilities of the Owner:

> **32. RESPONSIBILITIES OF OWNER.**   We'll act with customary diligence to:
>
> (1) keep common areas reasonably clean, subject to paragraph 26 (Condition of the Premises and Alterations);
> (2) maintain fixtures, furniture, hot water, heating and A/C equipment;
> (3) substantially comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and
> (4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

**71.**

The Lease also explains that trash collection, wastewater, and pest control are the responsibility of the owner:

> **7. UTILITIES.**   We'll pay for the following items, if checked:
> [X] water      [ ] gas      [ ] electricity   [ ] master antenna
> [X] wastewater   [X] trash   [ ] cable TV
> [X] other PestControl

25

**72.**

The Lease states that each tenant will be provided with a mailbox key.

**73.**

The Lease acknowledges that the owner is responsible for "conditions materially affecting the health and safety of ordinary persons"; specifically, the Lease states that tenants do <u>not</u> accept health-and-safety conditions as-is, but instead that only non-health-and-safety conditions are accepted as-is.

*Conditions in the Common Areas of Parc Fontaine, the Reality of the "Amenities", and the Deficient Management & Maintenance Services Provided to Tenants*

**74.**

Parc Fontaine does not provide the quality community services it promised the State of Louisiana it would provide to the whole resident community and that PAC continues to insist that it does provide.

**75.**

Parc Fontaine's common areas are in deplorable condition.  This includes issues with the security for the entire premises; unusable pool areas; trash and overflowing dumpsters; problems with the laundry area; dilapidated and unmonitored mail room; terrible fitness center offerings; pests including rats, gnats, roaches, opossums, and termites; and sewage seeping into the sidewalks and roadways.

**76.**

The security for the entire premises is also deficient, both because of the lack of security personnel and also because of the lack of security structures (no working security gate, holes in fences, broken lights, etc.).

26

**77.**

As noted by Councilman King, the front security gates were broken and there was a lack of security guards.  As of approximately September 20, 2023, the current entry gate on the right-hand side of the guard shack still does not work.[19]

**78.**

Such security risk and resulting crime are also the subject of online complaints, including the following online Google reviews highlighting security and crime risks:

- **Most of the building and street lights are broken (see picture). At night, I'm afraid to leave my apartment due to the darkness. Especially with all the car robberies and murders in the area, this is a huge target for criminals and safety issue. I went to the leasing office to complain about the issue and the leasing agent (Jamillah) was very rude and stated it was not the leasing office responsibility.**[20]

- **"[A]bsolutely the worst place to live seriously, my car has been broken into TWICE & the manager robin said that has nothing to do with her rats and roach infested!!!! Not a good place for families with children asked for cooperates # and robin the manager gave me her email instead trying to convince me it was cooperates email."**[21]

- **"… My tires were stolen off my car. . . . Do NOT waste your time or money on these run down apartments and dimwitted staff."**[22]

- **"Never fix anything, hallways smell, the walls are covered in dirt and mildew. Property managers are absolutely worthless, they have no sense of urgency.**

- **Gates are always broken and there is no security but we pay for security in our rent. Trash is always constantly running over, pool is never operable, just tacky"**[23]

---

[19] The gate on the other side is working as of approximately September 20, 2023.
[20] Review by Donald Johnson (emphasis added).
[21] Review by Karlayah James (emphasis added).
[22] Review by Ginger Reed (emphasis added).
[23] Review by Kiss Nicole (emphasis added).

**79.**

Although Defendants discussed starting a community watch program which could have increased security at the complex when they took over Parc Fontaine, Defendants never started this program.

**80.**

Recently, Parc Fontaine Apartments has also been the scene of **four rape attacks by a serial rapist**.[24]  In an April 11, 2023 news report—more than six months after Councilman King went on record reporting that "there was no security guard at the front gate, the gate stayed … open"—Parc Fontaine management told the news agency investigating the rapes that they were "working to get it fixed" and "trying" to hire security guards.[25]

**81.**

In addition, although in the past there had been a security guard on the premises (shortly after Defendants took over the complex), a few years ago Defendants got rid of the regular security presence until very recently, and even now the security presence is inadequate.  By the time Mr. Hills moved in, he never saw security at the front gate during his time there. Even though there is a security shack, it is so dilapidated it is unusable.  Aside from the rape threats, tenants like Mr. Hills personally experienced fear when they heard gunshots coming from within the complex while living there.  Even now, after the rape threat, the Parc Fontaine continues to cut corners. Although it now has a nominal security guard, that guard routinely has his headphones in and

---

[24]    https://www.fox8live.com/2023/04/11/victim-recounts-harrowing-experience-nopd-searches-suspected-serial-rapist/.
[25]    https://www.fox8live.com/2023/04/11/victim-recounts-harrowing-experience-nopd-searches-suspected-serial-rapist/.

spends most of his time posted up at the entrance, scrolling the phone.  The security is so lax that Mr. Hills has only periodically even ever seen a patrol located on the premises.

**82.**

Bizarrely, even though Parc Fontaine told the press it would fix gates after the rape debacle, and even though Parc Fontaine sent an email to residents stating that they had fixed the gate issues, Parc Fontaine chose only to fix the exit gates; the front _entry_ gate remains broken as of approximately September 20, 2023, allowing criminal elements to enter unimpeded.

**83.**

Defendants do not adequately maintain the fencing at Parc Fontaine either.  For instance, in the back of the apartment complex, there is a wooden fence that had a large hole in it for approximately 3 years before it was finally repaired.  There is also a chain-link fence between the apartment complex and Winn-Dixie.  One part of the fence still has a large hole that allows uncontrolled pedestrian traffic.

**84.**

In addition to security issues, the pool is regularly filthy and filled with greenish water—which stands in stark contrast to pool images in the financing application and the facility website, as these pictures show:





*^View of Pool Facilities in Defendants'*
*Funding Application in 2012*

*^View of Pool Facilities as Listed on the*
*Parc Fontaine Website under "Amenities"*



*<Typical View of Pool Facilities*
*in Reality*

**85.**

The gates around the pool are broken gates.

**86.**

The pool is also the subject of complaints in online reviews, including the following:





**87.**

Although Parc Fontaine advertises that it has six pools available, it only has two.

**88.**

The two pools it has are rarely, if ever, open for the tenants to use. Instead, of the gates that actually do function around the pools, they are closed. For example, Mr. Hills never once saw the pools opened for use. In addition to the pools being unusable, they also create a health hazard; Ms. Matlock observed that the mosquitos are horrible around the pools.

**89.**

There is also filth and trash littering the premises, foul odors in the hallways, and the dumpsters are overflowing the majority of the time. The trash regularly overflows, and each overflow lasts multiple days at a time. While there can be litter anywhere, at Parc Fontaine the trash and litter are routinely left and not cleaned up for prolonged periods of time. For example, Mr. Hills regularly notice trash bags would get left by trees for days at a time. Ms. Matlock has observed overflowing trash bins as well, especially after Defendants chose not to continue using a clean-up crew's services, resulting in overflowing trash bins. This picture shows weathered and trampled trash on a staircase at Parc Fontaine:



**90.**

One reviewer noted on Google Reviews, "**Dumpsters are always full**".[26]    Another reviewer stated: "Never fix anything, **hallways smell**, the walls are covered in dirt and mildew. Property managers are absolutely worthless, they have no sense of urgency. Gates are always broken and there is no security but we pay for security in our rent. **Trash is always constantly running over**, pool is never operable, just tacky"[27]    A third reviewer stated in pertinent part: "…**Hallways and steps are filthy**."[28]  A fourth reviewer noted: "**smells like dumpster in most of the halls**, it's **trash in most of the ventilation** in the floor and ceilings."[29]

**91.**

Additionally, Mr. Hills observed hallways regularly smelling "like trash and urine."

**92.**

The laundromat-common area is regularly flooded with water and has machines that are often inoperable, as shown in this picture:

---

[26] Review by Ashley Nichole (screenshot of full review above in section discussing pool issues) (emphasis added).
[27] Review by Kiss Nicole (emphasis added).
[28] Review by Annie Payton (emphasis added).
[29] "Joe Bloe" (emphasis added).



**93.**

In addition, the laundry facilities are not free, nor are they coin-operated.  Instead, tenants

have to load special cards with credit from a card machine to get the laundry machines to work.

To do this, tenants must use a credit card to buy a loaded card from a special machine that dispenses

the loaded cards.  However, the machines that dispensed loaded cards were glitchy, which meant

that it was difficult, if not impossible, for some clients to use the laundry facilities at all.

**94.**

Even though Mr. Hills had a laundry facility adjacent to his apartment, he was not able to

actually use the laundry facility because the card machine would not accept his card.  When he

notified management, they told him they had to order a new machine, but the new machine never

came in.

**95.**

Ms. Matlock also reports "filthy-smelling" laundry rooms.  There was also bad lighting in

the laundry rooms, creating a safety and security threat so Ms. Matlock and other tenants could

not even use them safely at night.  Even when Ms. Matlock and other tenants were able to access

the laundry rooms, Ms. Matlock would at times lose money because the laundry machines did not wash clothes correctly.

**96.**

Additionally, the mail room that houses all resident mailboxes provides no security for the broken mailboxes.  Most, if not all, the mailboxes are routinely open, so that anyone can just walk in and grab anyone else's mail.  There is no protection safeguarding any tenant's mail; to the contrary, most of the mail slots are open due to broken locks. Lastly, there was bad lighting in the mail room, creating a safety and security threat.

**97.**

Although the Defendants advertise two fitness centers as amenities available at the complex, upon information and belief there is only one fitness center, and that fitness center is very dirty, there is very little equipment in the center at all, and much of the equipment that is in there is regularly broken.

**98.**

Finally, there are regular complaints of a host of vermin running rampant throughout the premises, including rats, roaches, and possums in outside hallways and stairways and gnats and roaches in the laundry area.  There were also overgrown bushes and trees near the parking lot and the dumpsters, and this overgrowth harbored vermin and other pests.  For instance, roaches and gnats run rampant in the laundry area, termites swarm around the wooden fence; possums roam around the apartment complex; the hallways have rats in them, there is a large number of mosquitos due to the standing water in the pools; and there are bedbugs.

**99.**

The presence of these pests permeated the complex and created an unhealthy and unsanitary environment for all tenants. As is usual with pests, they are not confined to one unit, but instead move freely throughout the entire facility. Some online reviews include the following pest-related complaints, in pertinent part:[30]

- **"HORRIBLE!!!! from gnats roaches bees and RATS😱 mold, no heat for when it's cold!"**[31]

- **"Termites eating through the roof. Leaking roof on top of that. Mold and bugs."**[32]

- **It's gloomy and it's wild life running through the hallways…**[33]

- **"There are termites and mold issues."**[34]

- **"If I could do zero then I would. BIG ROOF RATS included in lease too."**[35]

- **"WORST PLACE EVER!!! It is infested with roaches do not move here please...found a roaches on my daughter bed,[ ]my bed and it's worse in the kitchen one fell on my head as I was cooking and it's the small one too.. I am a very clean person and I don't leave a mess anywhere but this infestation is ridiculous!!!! Never been thru this in my life[.]"**[36]

- **"It is infested with roaches, maintenance will not fix your problems, staff is rude. DO NOT LIVE HERE[.]"**[37]

- **"[L]et's not talk about roches [sic] omg"**[38]

---

[30] Grammatical, spelling, and spacing errors occur in the original text of the reviews and have not been altered unless otherwise noted.
[31] Review by Kyona Lemon (emphasis added).
[32] Review by Forever Mopar (emphasis added).
[33] Review by "Joe Bloe" (emphasis added).
[34] Review by Annie Payton (emphasis added).
[35] Review by "Killa Queen" (emphasis added).
[36] Review by Ruth Bermudez (emphasis added).
[37] Review by Terrell Lamb (emphasis added).
[38] Review by Lair Elliott (emphasis added).

- **"The apartments are filled with gnats, bed bugs, and possums. The ceilings are leaking as well."**[39]

- **". . . rats and roach infested!!!!"**[40]

**100.**

There are also water and sewer issues that affect the complex at-large, including sewage seeping into the public areas like the sidewalks.

**101.**

For instance, as one reviewer stated, "this place needs to be shut down or reported to the board of health **you walk out from your apartment your walking into backup from the toilets with human feces And toilet paper on the ground** fist chance I get."[41]

**102.**

As you walk through Parc Fontaine, there is also a mix of water—including a mix of fresh and sewer water—leaking out onto the sidewalks and in the main streets.

**103.**

Additionally, a Sewage and Water Board worker, who was recently assigned to check the water meters at Parc Fontaine, stated that Parc Fontaine was not adequately maintaining its water systems which resulted in residents having little to no water pressure in the laundry room (as well as in some units). That worker also stated that it would only take a day or two to fix the issue but Parc Fontaine refused to acknowledge the problem.

---

[39] Review by Fredericka Braidsbydreak (emphasis added).
[40] Review by Karlayah James (emphasis added).
[41] Review by Lair Elliott (emphasis added) (errors in original).

**104.**

Together, all these issues result in Parc Fontaine being riddled with health, safety, and security violations that make it unfit for habitation and violate the law and the standard lease agreement.[42]

**105.**

The cause of each Class Member signing a lease agreement was to have a healthy, safe, and sanitary place of accommodation.  This is the reason each party obligated himself to pay rent.

### IV.    CLASS ALLEGATIONS

**106.**

Plaintiffs seek to represent a class under the laws of the State of Louisiana defined as:

All natural persons who either currently or formerly resided at an apartment unit at
Parc Fontaine Apartments any time during the Class Period.[43]

These individuals are hereinafter referred to as "Class Members" and this group is hereinafter referred to as "the Class."

**107.**

Excluded from the Class are Defendants, their affiliates, employees, officers and directors, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify, change, or expand the Class definitions based on discovery and further investigation.

---

[42] Exhibit 7, Matlock Lease Agreement; Exhibit 8, Hills Lease Agreement; Exhibit 9, Martin Lease Agreement
[43] The Class Period is defined as ten (10) years prior to the filing of state court Petition through the termination of this litigation.

**108.**

As explained in more detail below, Plaintiffs have sustained damages, including loss of rent money without the correspondingly-owed living area fit for habitation; in addition to these damages, Plaintiffs also seeks attorneys fees, court costs, litigation costs, and other damages.

**109.**

As explained in more detail below, Plaintiffs and all Class Members sustained damages as a result of Defendants' conduct alleged in this Petition.  Plaintiffs' claims are typical of the claims of the Class.  The class representatives will fairly and adequately protect the interest of the Class. Furthermore, the Plaintiffs, Class Representatives herein, are represented by skilled attorneys experienced in the handling of class litigation and healthy and safe apartment law and who may be expected to handle this action in a matter in the best interest of the Class.

**110.**

<u>NUMEROSITY</u>:[44]  The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds—possibly thousands—of class members exist for each class.[45]

---

[44] F.R.C.P. 23(a)(1).

[45] There are 702 units.  Three of the four floor plans offered are for two- or three-bedroom apartments.  MOF-Preservation's 2019 900 Tax Form for shows total revenue of $59,740,971 for the current year and $104,726,527 for the prior year.  These facts, along with the occupancy size, together suggest that the class size is so numerous as to not be susceptible to joinder and instead to require class status.  Additionally, Parc-Fontaine LLC told the State it would service 1,500 residents.  These facts mean that the proposed class is easily defined, because it includes lessees with Parc Fontaine or otherwise was legally living at Parc Fontaine (such as other tenants listed on a given lease).  Parc Fontaine tenant and lease records should all Class Members, and Class Members themselves will also know if they lived at Parc Fontaine, making them eligible Class Members.

**111.**

COMMONALITY:[46]  There are questions of law and fact common to the class, including, but not limited to, determination of whether Defendants failed to properly maintain common areas provide pest control, and provide services to all residents.  Upon information and belief, a standard-form lease agreement covers all Class Members.  Additionally, this case only involves one apartment complex—Parc Fontaine and one group of Defendants (the current ownership and management of the apartment complex, not prior ownership or management).  Finally, the claims arise from problems to the common areas of the building and general systems (such as general rent payment systems and maintenance); this proposed class does not involve individual personal injury claims or individual, unit-based claims, such as claims for mold exposure in an individual unit.

**112.**

TYPICALITY:[47] The claims and defenses of the Plaintiffs are typical of those of the Class.  Plaintiffs' claims arise out of the same events, practices, and courses of conduct giving rise to the other Class Members' claims (*e.g.*, not properly maintaining common recreation areas, like the pool; failure to keep the common entry gate operation; failure to provide security to the complex at-large; deficient maintenance and accounting services, etc.).  Plaintiffs' claims, like all Class Members' claims which are discussed below, are based on the same legal theories, especially legal theories related to breach of contract (*e.g.*, breach of standard form lease contract, breach of warranties that flow from breach of lease).  Additionally, all Class Members resided at the same apartment complex, Parc Fontaine.

---

[46] F.R.C.P. 23(a)(2).
[47] F.R.C.P. 23(a)(3).

**113.**

ADEQUACY OF REPRESENTATION:[48] Plaintiffs are adequate Class representatives because, for example, as former and current tenants themselves, they possess first-hand knowledge of the deficiencies that equally plague and have plagued all residents of the Parc Fontaine Apartments, such as filthy common areas and lack of services.  Plaintiffs have also personally suffered from the unsafe, unsanitary living conditions at Parc Fontaine and from Parc Fontaine's failure to provide services and amenities they promised.  Plaintiffs are also an adequate representative because they have retained counsel competent and experienced in class action litigation and healthy and safe apartment law, and Plaintiffs and their attorneys intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

**114.**

ADDITIONAL INFORMATION:[49] A class action in superior to the other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs allege that the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class which would establish incompatible standards of conduct by the parties opposing the class, and adjudication with respect to the individual members of the Class would be dipositive of the interest of other members not parties to the adjudication, or would substantially impair or impeded their ability to protect their interests.  There are common questions of law and fact common to the Class that predominate over questions involving individual members, making a class action the superior

---

[48] F.R.C.P. 23(a)(4).
[49] FF.R.C.P. 23(b).

method of adjudication.  For instance, this Class does <u>not</u> bring claims regarding to mold exposure within individual apartments.  Instead, the fact-finder in this case need only focus on common areas and common operational problems equally applicable to the entire Class.  For example, a fact-finder might need to determine if Defendants breached their contractual duty to provide pest control at Parc Fontaine.

**115.**

Plaintiffs will move for class certification in accordance with Federal Rule of Civil Procedure 23.

**V.      CAUSES OF ACTION**

**COUNT 1: FAILURE TO PERFORM OBLIGATION OF LEASE (BREACH OF CONTRACT CLAIMS)**

**116.**

Plaintiffs re-allege Paragraphs 1-115 as though copied herein *in extenso*.

**117.**

As outlined above, Defendants knowingly and in bad faith failed to perform their obligations pursuant to the lease contract.  Their failures to perform included defective and/or delayed performance of obligations to maintain the common areas of the facility and to provide common support and community services.

**118.**

At all times pertinent to this matter, the Class Members had valid leases in place and had complied with all provisions of the uniform lease, such as paying rent.

**119.**

The cause of the lease agreement—the reason the Class Members bound themselves to pay rent—was in exchange for a habitable community to live in, including (in addition to access to an apartment) accompanying services for their units and safe, secure, and sanitary common areas.

**120.**

Pursuant to Louisiana lease law, Defendants (the lessors) have an obligation to maintain the leased things (including corresponding access to the common areas) in a condition suitable for the purpose for which it was leased.  La. C.C. art. 2691.  Defendants have breached this obligation in numerous ways, including, but not limited to, failure to maintain the pools that are actively advertised on its website, failure to provide a functioning gated at what is advertised as a gated community, provide pest control pursuant to the Lease, provide functioning administrative support (for rent payment), etc.

**121.**

As outlined by the facts above, Defendants' failure to perform was in bad faith making them liable for all damages resulting from their failure to perform under La. C.C. art. 1997.  In the alternative, Defendants' failure to perform was in good faith pursuant to La. C.C. art. 1996.

**122.**

The Class Members did not get the benefit of the bargain that they paid for pursuant to the lease because instead of providing a habitable place to live, Defendants instead provided an inhospitable environment riddled with health and safety issues.

**COUNT 2: BREACH OF WARRANTY OF SUITABILITY**

**123.**

Plaintiffs re-allege Paragraphs 1-115 as though copied herein *in extenso*.

**124.**

Defendants, as lessors, warrant that the thing leased is suitable for the purpose for which it was leased.  La. C.C. art. 2696.

**125.**

The purpose for which Lease was executed was to provide each tenant and lawful residents with accommodations in a safe, secure, and sanitary community.

**126.**

Instead, in exchange for rent, the Class got an unsafe and insecure community to live in, riddled with, *inter alia*, flaws such as lack of proper lighting and broken security access gates.

**127.**

Additionally, unsanitary conditions were rampant, including, *inter alia*, noxious odors, overflowing dumpsters, green pools, litter throughout the premises and an array of vermin—rats, termites, roaches, etc.

**128.**

Maintenances services required under the lease were also deficiently provided.

**129.**

Under such circumstances, Defendants failed to provide an apartment complex community suitable for the purpose of providing a safe, secure, and sanitary community to live in.

**COUNT 3: BREACH OF WARRANTY AGAINST VICES AND DEFECTS**

**130.**

Plaintiffs re-allege Paragraphs 1-115 as though copied herein *in extenso*.

**131.**

Defendants also breached their warranty that the leased thing was free of vices or defects that would prevent its use for the purpose of providing a safe, secure, and sanitary community to live in.

**132.**

Specifically, the premises was riddled with vices, including infestation by pests and sewage and filth in the common areas.

**133.**

The premises were also riddled with defects, such as defective gates (both near the pool area and at the entry point) and defective laundry machines.  These defects created unsafe and unsanitary living conditions.

**134.**

Under such circumstances, Defendants failed to provide an apartment complex community free of vices and defects.

**COUNT 4: NEGLIGENT OR IN THE ALTERNATIVE INTENTIONAL MISREPRESENTATION**

**135.**

Plaintiffs re-alleges Paragraphs 1-115 as though copied herein *in extenso*.

**136.**

Plaintiff also alleges that Defendants are liable for negligent misrepresentation, including information contained in their consistent and repeated promises to provide a safe, sanitary, and healthy premises and their repeated promises to provide social services, both to secure financing and to lure and keep tenants into the facility through advertising and discussions about improved programs, such as discussions to create a community watch program.

**137.**

Defendants, in the course of their business and the affordable housing projects in which they had a pecuniary interest, supplied false information both to Louisiana to secure financing and to tenants. Such false information includes, but is not limited to, promises to provide social services and clean, safe, and sanitary housing, trash pickup, etc.

**138.**

Defendants had a legal duty to supply correct information to the Plaintiff and Class Members when advertising the apartments, promising the State it would provide certain services, and including obligations in the standard lease contracts.

**139.**

Defendants breached this duty by omission as well as by affirmative misrepresentation. For example, Defendants misrepresented the facilities on the premises, by indicating that clean pools would be available for use and that services would be provided, even though they were not.

**140.**

Plaintiffs and, upon information and belief, all Class Members, first discovered the misrepresentations that Defendants made to the State of Louisiana on or about November 14, 2022, when the local news started running stories about how the Foundation had received state financing.

**141.**

Plaintiffs and Class Members were intended beneficiaries of the financing agreement, since as residents they were supposed to benefit from low-cost, safe housing with social services, which ultimately they were not provided with.

**142.**

Plaintiffs and the Class suffered pecuniary loss by justifiably relying on Defendants misrepresentations since they paid renting believing they were getting housing at a safe, sanitary community with attendant benefits but instead got access to apartments not fit for human habitation.

**COUNT 5: ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT**

**143.**

Plaintiffs re-allege Paragraphs 1-115 as though copied herein *in extenso*.

**144.**

In the alternative, to the extent this Court rejects any of Plaintiffs other claims, Plaintiffs bring a claim for unjust enrichment, since their rent payments enriched the Defendants and correspondingly impoverished the Plaintiffs.  This enrichment/impoverishment scheme was connected through the payment of rent.  The enrichment was unjustified because the Apartment Defendants did not uphold their end of the bargain, misled the government, and promised to provide things that they never ultimately provided—not only impoverishing the tenants but also imperiling their health and safety.

**COUNT 6: DECLARATORY JUDGMENT**

**145.**

Plaintiffs re-allege Paragraphs 1-115 as though copied herein *in extenso*.

**146.**

Contract interpretation and statutory interpretation are questions of law.[50]

---

[50] *Minor v. Casualty Reciprocal Exchange*, 96-2096, p. 3 (La. App. 1st Cir. 9/19/97), 700 So. 2d 951, 953, *writ denied*, 97-2585 (La. 12/19/97), 706 So. 2d 463 (contract interpretation is a question of law); *Clements v. Folse*, 2001-1970 (La. App. 1 Cir. 08/14/02), 830 So. 2d 307, 311-12; *Arthur*

**147.**

Contract interpretation hinges on the common intent of the parties.[51] A well-drafted contract clearly expresses the intent of the parties and, as such, it is enforced as written so long as it does not lead to absurd consequences.[52]

**148.**

Under Louisiana Code of Civil Procedure art. 1871 *et seq.*, this court may declare the rights, statuses, and other legal relations between the parties in this case.

**149.**

As outlined above, the Lease includes a Responsibilities of Owner provision that requires the Defendants (1) to keep common areas reasonably clean; (2) maintain fixtures, furniture, equipment, etc.; (3) comply with the law (which they would be required to do even if it were not included in the Lease); and (4) make reasonable repairs.  The Lease also includes a Utilities provision, which states that the Defendants are responsible for providing water, wastewater, trash, and pest control services.

**150.**

HUD requires all residents of HUD housing live in safe, habitable dwellings.  The Code of Federal Regulations states in pertinent part:

> (a) General. **To ensure that all residents live in safe, habitable dwellings, the items and components located inside the building, outside the building, and within the units of HUD housing must be functionally adequate, operable, and free of health and safety hazards. The standards under this section apply to all**

---

*Copes, Orthotist, Inc. v. Am. Cent. Ins. Co.*, 85 Fed. Appx. 391, 393 (5th Cir. 2004) (contract interpretation is a question of law); *Jones v. State (Par. of E. Baton Rouge)*, 2023 La. LEXIS 1021 *4 | 2023-01455 (La. 05/05/23) (statutory interpretation is a question of law).
[51] La. C.C. art. 2045.
[52] La. C.C. art. 2046.

**HUD housing.** HUD housing under the HCV, PBV, and Moderate Rehabilitation programs shall be subject to these standards only for:

> (1) The subsidized unit itself; and
>
> **(2) Items and components within the primary and secondary means of egress from a unit's entry door(s) to the public way, those common features related to the residential use of the building (e.g., the laundry room, community room, mail room), and the systems equipment that directly services the subsidized unit.**

…

(c) Outside. Outside of HUD housing (or "outside areas") refers to the building site, building exterior components, and any building systems located outside of the building or unit. **Examples of "outside" components may include fencing, retaining walls, grounds, lighting, mailboxes, project signs, parking lots, detached garage or carport, driveways, play areas and equipment, refuse disposal, roads, storm drainage, non-dwelling buildings, and walkways. Components found on the exterior of the building are also considered outside areas, and examples may include doors, attached porches, attached patios, balconies, car ports, fire escapes, foundations, lighting, roofs, walls, and windows.** The outside area must meet the following affirmative requirements:

> (1) For the outside area, outlets within 6 feet of a water source must be GFCI protected; and
>
> (2) The outside area must have a guardrail when there is an elevated walking surface with a drop off of 30 inches or greater measured vertically.

…

**(e) Health and safety concerns —**

**(1) General. The inside, outside and unit must be free of health and safety hazards that pose a danger to residents. Types of health and safety concerns include, but are not limited to** carbon monoxide, electrical hazards, extreme temperature, flammable materials or other fire hazards**, garbage and debris, handrail hazards, infestation, lead-based paint, mold, and structural soundness.**[53]

### 151.

Plaintiffs seek a declaratory judgment that Defendants violated the terms of the lease regarding safe and healthy housing and legal regulations governing safe and healthy housing, including, but not limited to, HUD regulations.

---

[53] 24 C.F.R. 5.703 (emphasis added).

## VI.   DAMAGES

### 152.

As a result of the above, the Class suffered financial losses in the form of paying rent for apartment units and apartment facilities that were inadequately provided and other consequential damages arising from Defendants conduct.  Some Class Members also suffered physical injury (such as the rape victims or exposure to mold leading to health issues), but those personal injury damages are <u>not</u> part of this litigation since they are not common to the Class.[54]

### 153.

The Class's damages were directly caused by the acts and omissions and/or commissions on the part of Defendants as outlined above.

### 154.

As a result of the above, the Class seeks damages including, but not limited to:  Return of all rent money or in the alternative return of part of rent money and consequential damages.

### 155.

Additionally, the Class also seeks declaratory relief and asks that this Court issue an order that Defendants' had a duty to fully comply with the terms of the Lease and to perform all obligations pursuant to the lease, including adequate provision of water, wastewater methods, trash, and pest control and including (1) keeping common areas reasonably clean, (2) maintaining fixtures, future, hot water, heating, and A/C equipment, (3) complying with applicable federal, state, and local laws, regarding safety, sanitation, and fair housing; and (4) making all reasonable repairs, subject to tenants' obligations to pay for damages for which tenants were liable.

---

[54] Because physical injury damages are not part of this litigation, Plaintiffs and Class members specifically reserve their right to pursue individual personal injury claims.

**156.**

The Class seeks in excess of ten thousand dollars exclusive of interest and costs.

**157.**

The Class requests a trial by jury.

WHEREFORE, Plaintiffs Ms. Matlock, Mr. Hills, and Mr. Martin pray that Defendants, RICHARD HAMLET; MOF-PRESERVATION OF AFFORDABILITY CORP. (F/K/A: GMF-PRESERVATION OF AFFORDABILITY CORP.); MINISTRY OUTREACH FOUNDATION (F/K/A: GLOBAL MINISTRIES FOUNDATION); MOF PARC-FONTAINE, LLC (F/K/A: GMF-PARC FONTAINE, LLC; and PAC HOUSING GROUP, LLC ("PAC"), after service of this First Supplemental and Amending Petition, and response thereto, , and after the expiration of all legal delays, and due proceedings are had, that the Class be certified and that there be judgment in favor of Plaintiffs and against Defendants in an amount of damages reasonable and found reasonable at trial, together with declaratory relief and legal interest thereon, from the date of judicial demand until paid in full, as well as all costs of these proceedings, and all other general and equitable relief, including an order to fulfill all legal and lease obligations.

SIGNATURE BLOCK ON FOLLOWING PAGE

Respectfully Submitted,

**BRAGAR EAGEL & SQUIRE P.C**

BY:     */s/ Casey C. DeReus*
Casey C. DeReus (La. Bar #37096)
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5888
Facsimile: (212) 486-0462
Email for Service:  dereus@bespc.com
*Attorneys for Plaintiffs*

and

**DeVonn Jarrett, Esq. (#35843)**
**JARRETT LAW GROUP, LLC**
643 Magazine St.., Suite 301A
New Orleans, Louisiana 70130
Telephone: 833- 554-6653
Email:djarrett@jarrettlawgroup.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 10th day of October 2023, served a copy of the foregoing pleading to all parties to this proceeding by filing through the CM/ECF electronic filing system.

_____*/s/ Casey C. DeReus*_____
**Casey C. DeReus**